# THE PROBATE COURT

OF THE

## CITY AND COUNTY OF SAN FRANCISCO

FROM

## JANUARY 1, 1872, TO DECEMBER 31, 1879.

---

### ESTATE OF H. H. BYRNE.

#### No. 4645—1872.

UNDUE INFLUENCE—WILL DRAFTED BY BENEFICIARY.—The fact that the beneficiary drafted the proposed will, is, in itself, only a suspicious circumstance, which might prompt a closer scrutiny on the probate; but when the execution, in all other respects, is free from criticism, the mere drafting by the person to be benefited, can raise no presumption of undue influence.

WIDOW'S ALLOWANCE.—The right of a widow to have an allowance set over to her out of the estate, may very properly be tested by reference to her relations with deceased, and her right, as wife, to call on him for her maintenance during his lifetime.

A wife who has separated from her husband; re-married under the erroneous impression that she was divorced; had children by such second marriage; and never, at any time, had conjugal relations with decedent, cannot be said to be a member of his family, so as to entitle her to a family or widow's allowance.

Construing sections, C. C. 1272; C. C. P. 1312, 1466-8.

*T. W. Freelon*, for proponent.

*Wm. Loewy*, for heirs.

The deceased was a well known member of the Bar of

San Francisco, and had held responsible positions under the city government. The deceased and E. R. Carpentier (who was also an attorney), had been intimate friends for many years. During his last illness, deceased gave directions to Mr. Carpentier for the drafting of a will; and the will proposed was drawn by him accordingly. None but the two knew of its contents during the life of Mr. Byrne. After some small legacies, Mr. Carpentier was made residuary legatee, the estate being then supposed to be quite large. The witnesses to the will were both physicians, in attendance on the deceased, one was a life-long friend. They saw the will signed, and testified as to the soundness of mind of deceased.

By the Court: If a beneficiary draft a will, it is of itself ground for suspicion, and the circumstances of its execution should have close scrutiny. In this case there is no evidence of undue influence. The deceased was in possession of his faculties, and made the will as he desired.

Will admitted to probate.

After the issuance of letters, a petition of Matilda Heron Byrne was filed, claiming to be the widow of deceased, and asking for a family allowance.

*Hall McAllister*, for petitioner.

*A. Campbell*, for Carpentier.

By the Court: The petitioner and deceased intermarried in this city in 1853. There is no evidence of cohabitation. If there was any such act, it was followed by immediate separation; there has been no issue. Subsequently divorce proceedings were instituted; and petitioner was informed by her attorney that a decree of divorce had been granted. The information was incorrect; but she, believing it to be correct, intermarried (as she supposed) with one Stoepel. She was, during all the time, pursuing her profession as an actress in various cities of the United States. In March, 1869, she commenced in New York an action for divorce from Stoepel, alleging the issue of the marriage to be one child then living.

Stoepel and the petitioner lived together as husband and wife from 1857 to 1869. After the separation of Stoepel and petitioner, there was no cohabitation of herself and Byrne, nor residence together, nor public acknowledgment as husband and wife, nor assumption of marital rights, nor pecuniary aid furnished by him. She alleges, however, that there was restoration of friendly feeling between them.

Under this state of facts, it was argued and considered whether, as a matter of law, the petitioner was entitled to family allowance.

Sec. 122 of the Probate Act provides that the "Probate Court or Judge shall make such reasonable allowance out of the estate as shall be necessary for the maintenance of the family according to their circumstances," &c.

The right to an allowance is not a common law right; it is founded upon the statute alone. It is quite different from the right of the heir to inherit, or of the widow to her dower, or of the right of the wife to one-half of the community property. It is an allowance made to *the family*. Who are intended by the statute to be included in the family? In one sense, all persons living as one household are members of the family; which may thus embrace married children and their children, boarders, servants, and even visitors; yet it would hardly be supposed that all these would be entitled to an allowance. I think that the statute was intended to embrace those who were the *immediate* family of the deceased; those who were by law entitled, up to his death, to look to him for support and protection. This would include the wife, minor children, and, perhaps, in exceptional cases, helpless parents and other relatives. Yet any person, to be entitled to an allowance out of the estate, must have been in the receipt, or in law, entitled to demand, of deceased a maintenance before his death.

The next question is, was the petitioner, at and prior to the time of the death of deceased, entitled to demand to be maintained by him? Could she at any time after the alleged marriage with Stoepel, have left him and returned to Byrne and demanded and required maintenance? Would Byrne have been bound to receive

her into his own house or provide for her elsewhere? Was she, in fact, or was she entitled to be considered, a member of his family? That she was in fact, is not contended for; so we have to consider the latter point only. A husband is bound to maintain his wife so long as she remains in his house, no matter what may be her conduct; so, too, if he drive her away; or she be compelled to leave by reason of his cruelty, or if she separate from him in consequence of his adultery; so, if she go away without cause and be willing to return; so, if they separate by mutual consent; so, if she elope and be willing to return. But if she go away and co-habit with another, he will not be liable for her support, even though she be willing to return.

At the time petitioner was married to Stoepel, she believed that her relations with Byrne had been dissolved; she was so informed by her attorney, in whom she had confidence. This fact is addressed to the moral consideration only, and does not change the legal effect which her relations with Stoepel had upon her relations with Byrne. If she believed that she was free to marry Stoepel, it necessarily follows that she did not regard herself as being any longer a member of Byrne's family; of course it would be impossible to owe allegiance to two living husbands, and have two homes, between which choice might be made at will. By her marriage and cohabitation with Stoepel, Byrne was released from all further liability. She could not renew that liability by offering to return. It could be renewed only by his reception and acknowledgment of her, or by his voluntary assumption of the liability.

Chancellor Kent (2 Kent, 146-7) says: "The husband is bound to provide his wife with necessaries suitable to her condition and his situation in life; and if she contract debts for them during cohabitation, he is obliged to pay those debts. * * * If the husband abandon the wife, or they separate by consent, without provision for her maintenance, or if he send her away, he is liable for her necessaries, and he sends credit with her to that extent. It has been a question whether, if the wife elopes, and repents, and returns again, and her husband refuses to receive her, he is then

bound for her necessaries. The opinion of Lord Ch. Raymond was that he would be liable, if he refused to receive her; and the same doctrine is declared in New York; but it does not apply where the wife had committed adultery."

She may have been sincere in believing herself not the wife of Byrne, yet if the marriage with him was undissolved, her relations with Stoepel were inconsistent therewith. By the death of Byrne she was not deprived of any means of support which she had theretofore enjoyed.

The petition is dismissed.